UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


TRACY L. CONNALLY                CIVIL ACTION NO. 09-1602

VERSUS
                                 DISTRICT JUDGE DEE D. DRELL

METROPOLITAN LIFE INSURANCE
        COMPANY                  U.S. MAGISTRATE JUDGE JAMES D. KIRK


## REPORT AND RECOMMENDATION

This Employees Retirement Income Security Act ("ERISA") case, 29 U.S.C.1001 et seq., is referred to me by the district judge for Report and Recommendation.  The case is ready for decision on briefs on the merits in accordance with the ERISA Briefing Order [Doc. #13].

## Facts

Claimant, TRACY CONNALLY, age 44, worked at Home Depot in Leesville as a Pro Account Sales Associate until May 25, 2006 when she stopped work due to complaints of depression and panic attacks as a result of the accidental death of her college age only child in 2005. She then applied for disability benefits under Home Depot's long term disability plan, administered by MetLife. The Plan began paying benefits effective November 30, 2006, subject to a 26 week elimination period.

In May 2007 the plaintiff's short term claim was reviewed and an independent physicians evaluation by Dr. Charles Clark was obtained to determine if plaintiff was still disabled.  Dr. Clark found documented evidence of impairment as described by plaintiff's treating physicians, Dr. Lord of Leesville and Dr. Benghazi of Alexandria. Dr. Clark concluded that "the medical information supports functional limitations beyond 06/22/2006."[1]

In April 2008 MetLife notified Connally that her long term claim had been approved, based on depression, effective November 30, 2006. The notification said that benefits would cease as of May 2008 since mental disorders such as depression were subject to a 24 month maximum benefit period. In February, however, Dr. Benghozi diagnosed plaintiff with Bipolar II disorder, a condition under the policy not subject to the 24 month limitation.

MetLife again reviewed the claim in November 2008 and determined that plaintiff was no longer disabled, based on the opinions of the case management specialist and an unnamed "clinical specialist". MetLife determined that the medical information no longer supported a finding of an impairment that would prevent plaintiff from working.

Plaintiff appealed the decision in March 2009 and, after review by a new consultant psychiatrist, Dr. Rummler, and not by

---

[1] Around the same time an evaluation was performed by Dr. Achong, but it appears that that evaluation too was related to the plaintiff's short term disability claim.

the physician who had reviewed the claim before, Dr. Clark, the decision was upheld by MetLife on April 27, 2009 for the reason that plaintiff had not provided medically substantiated support for a finding of disability beyond November 24, 2008.

Plaintiff filed this suit appealing the decision which was timely removed to this court on the basis of ERISA. Plaintiff claims she suffers from, among other things, depression and bipolar disorder and cannot work.

### Standard of Review

In accordance with this court's standing ERISA Case Order, the parties agree that the Group Long Term Disability Plan issued by defendant is an employee welfare benefit plan, as defined by the provisions of ERISA, and that this case is governed by ERISA and that all state law claims are preempted.  The parties also agree that the Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make findings of fact and determine eligibility for benefits.  Both Claimant and Defendant agree that the administrative record is complete. However, because the administrator is both insurer and administrator and is thus conflicted, the court will  give a modicum less deference to the administrator's decision.  <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

## The Plan

The disability plan provides that an employee is disabled if she is under the regular care of a doctor and is unable to perform each of the material duties of her regular job or any gainful occupation for which she is reasonably qualified, taking into account education training and experience.  Benefits for mental disease are limited to 24 months unless they are due to schizophrenia, bipolar disorder, dementia or organic brain disease.

## The Medical Records

Ms. Connally's troubles began after her college age son tragically died. Thereafter, in June of 2006, she began treatment with her longtime physician, Dr. Greg Lord in Leesville, Louisiana. She had been previously diagnosed with depression by her OBGYN, Dr. Rudd, who prescribed Lexapro. Dr. Lord noted symptoms of anxiety and depression. He found her unable to work and told her not to work for eight weeks. In July Dr. Lord increased her Lexapro and prescribed Ativan for anxiety and Trazodone for sleep. Lord continued to find her depressed through December, 2006. He also found her to continue to be disabled due to panic attacks, depression, anxiety, fatigue, insomnia, crying spells, and difficulty concentrating and staying on task. Dr. Lord recommended intervention by a psychiatrist.

4

On Dr. Lord's referral, in March 2007 Connally saw Dr. Benghozi, a psychiatrist in Alexandria, Louisiana. He noted her irritability, anger, lashing out, flash backs to the accident, poor sleep and that she was isolated, scared to be around people and that she had a depressed mood, was tense, fearful and edgy. He diagnosed her with major depressive disorder, severe, without psychosis. Dr. Benghozi recommended medications management and therapy and referred her to a therapist. Benghozi noted that plaintiff had no history of having ever sought mental health treatment in the past.

Connally continued to see Dr. Benghozi and in June of 2007 he diagnosed anxiety, depression, panic attacks, neck pain, headaches dizziness and anxiousness. He continued to recommend medications therapy and found that factors which affected Connally's ability to work were that she was very anxious, unable to interact with coworkers or customers due to emotional limitations.  At the same time Dr. Lord opined that she was unable to perform her job due to emotional limitations.

In February 2008 Dr. Benghozi diagnosed plaintiff with Bipolar II disorder, post traumatic stress syndrome and panic disorder. He prescribed Wellbutrin XL and Vistaril as needed. In completing MetLife's questionnaire, Dr. Benghozi stated that Connally's disorder was affecting her ability to do activities of daily living because of mood swings, irritability, anxiety, panic attacks,

impulsive behavior and sleep disturbances as evidenced by her poor judgment, impulse spending and isolative behavior. He stated that the specific symptoms or functional impairments that would impair Connally from working were her mood lability and panic attacks as evidenced by her poor focus, increased anxiety and mood swings. He continued to find her unable to work as of May 2006.

In July 2008, Dr. Benghazi reported that plaintiff had had a miscarriage in September 2007 and continued the diagnosis of depression. He found her ability to work was compromised because of increased anxiety, depression, and panic attacks, as evidenced by increased anger, aggressive behavior, verbally abusive difficulty concentrating, sleep disturbances, and constant obsessions about her son. She was specifically impaired from working in the opinion of Dr. Benghozi because of her difficulty concentrating, high anxiety with panic attacks, poor impulse control, and mood lability. He also noted she was easily distracted and had poor concentration.

In October 2008 Benghozi saw plaintiff and said she had had another miscarriage. Because she was trying to become pregnant again, she had stopped taking her medications. Otherwise her findings and diagnosis were unchanged. Her return to work date was indefinite. He again diagnosed Bipolar II disorder.

## **Review for Abuse of Discretion**

Connally does not contest the administrator's interpretation of the Plan. See Wildbur v. ARCO Chem. Co., 974 F.2d 631 (5th Cir. 1992). Rather, claimant, through counsel, argues that there does not exist in the record substantial evidence to support the decision of the administrator and that the company placed too much emphasis on the opinions of its own consulting physician as opposed to plaintiff's treating doctors.

Eligibility for benefits under any ERISA plan is governed by the plain meaning of the plan language. Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286 (5th Cir. 1998). In determining whether an administrator abused its discretion, we look to whether that administrator was arbitrary or capricious. "An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial." Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d

211, 215 (5th Cir. 1999).  See also <u>Vega v. Nat'l Life Ins. Servs.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

_____The initial denial and the denial of reconsideration on appeal were all expressly based on the lack of objective medical evidence to support a finding of disability. Such a basis for a disability determination may constitute "substantial evidence" or "concrete evidence". See <u>Mouton v. Fresenius Medical Care of North</u>, 2003 WL 22287522 (5th Cir. 2003), <u>Dubose v. Prudential</u>, 2003 WL 23021934 (5th Cir. 2003)(unpublished), <u>Chandler v. Hartford</u>, 2006 WL 1209363 (5th Cir. 2006)(unpublished),<u>Ruiz v. Continental Casualty Co.</u>, 400 F.3d 986 (7th Cir. 2005), <u>Johnson v. Metropolitan</u>, 437 F.3d 809 (8th Cir. 2006), <u>Wangenstein v. Equifax, Inc.</u>, 2006 WL 2220822 (11th Cir. 2006)(unpublished).

MetLife's denial of benefits was explained by it in it's letter to plaintiff by Nicole Krause, Case Management Specialist. Krause stated that, in reviewing the medical information "there is not enough evidence to support a global severity of impairments from a psychiatric disorder that would prevent" Connally from performing her job at Home Depot. While it is not apparent what, if any, psychiatric medical training Krause has, she opines that "[a]ssociated cognitive difficulties in areas such as concentration and memory often seen in severe disorders are not supported with objective information as (sic) present." She suggests that the claim had been reviewed by a "clinical specialist", a job title not

explained nor a person who is identified in the record.[2] She continues that Dr. Benghozi had only indicated Connally's self reported symptoms and that no "objective data" such as therapy notes or "abnormal cognitive test results" had been provided. Incredibly, Krause states that there are no noted difficulties with observed ADLs, speech, behavior, or thought processes. She then concludes that Connally's panic attacks were not severe because not supported by emergency room visits, third party testimony or witnesses. She states that "[t]he information reviewed does not contain evidence of other symptoms that are more reliably associated with impairment, extreme mood liability (sic), morbid preoccupation with worthlessness or guilt, difficulties with reality testing, severe disorganization, impulsivity (sic) or poor judgments that require intervention, or substance abuse that requires medical treatment."

As mentioned, there is no indication in the record that Krause has any particular expertise in regard to mental health in general or psychiatry in particular. Although she references review by a clinical specialist, the language in her letter does not appear to be that of a physician, for it evidences confusion regarding plaintiff's diagnosis (as it relates to this appeal), Bipolar II

---

[2] I find no report of a "clinical specialist" in the administrative record and apparently neither does plaintiff's counsel who mentioned its absence in his brief. Despite the implied invitation, defendant has not referred the court to any report or letter in the record by this "clinical specialist". There are notes by Sarah A. Wnuk, "Nrs Cons Disab" at page 209-211 of the AR; however, the notes reflect only records review and attempts to contact providers.

disorder, and the symptoms she lists.  For example, some of the symptoms she says "are more reliably associated with impairment" such as disorganization, are findings that relate to schizophrenia and other mental diseases which have nothing whatsoever to do with this case or with plaintiff's diagnosis.

Further, Dr. Benghozi completed MetLife's own forms which asked what symptoms plaintiff <u>exhibited</u>.  There is no indication that the symptoms were subjective only. Even if they are, they are well documented by the medical experts who made the diagnoses.

The Plan document provides for disability benefits for mental disorder or disease and requires that the diagnosis meet the diagnostic criteria established in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). Krause's opinion is not supported by any medical evidence and is not even based on a physician review of the medical records and is contrary to MetLife's own review by Dr. Clark. Her letter nowhere references the Plan requirement that the diagnosis meet the DSM of Mental Disorders. Instead it alludes to the absence of a "global severity of impairments", something not found in the Plan or in the DSM.

Even a cursory review of the DSM shows that the symptoms listed by Krause have nothing to do with the diagnosis of Bipolar II disorder. The symptoms she lists are not required by the plan for a finding of disability and are not required by the DSM for a diagnosis. Instead, the DSM requires, among other things, that

10

there has been the occurrence of one or more Major Depressive Episodes accompanied by at least one Hypomanic Episode which cause significant distress or impairment in social, occupational, or other important areas of functioning.

The Plan requires, in Connally's case, a diagnosis of bipolar disorder and the inability to work. At the time of Krause's letter, both were well documented in the medical records and were supported by the latest medical opinion of Dr. Benghozi and by MetLife's own independent physician, Dr. Clark. The Case Management Specialist should not have substituted her opinion for the opinions of licensed psychiatrists.

Before Connally appealed Krause's termination of benefits, Dr. Benghozi issued a short report on February 6, 2009. He found that she was still diagnosed with Bipolar II disorder.  She was still seeing the therapist and was back on her medications. He reported that her symptoms were getting significantly worse and she was still not able to work.

The therapist, Kathy Blackman, reported a summary of plaintiff's symptoms on March 23, 2009. She reported that Connally had gotten off her medications periodically in order to try to become pregnant, something Dr. Benghozi had suggested. She also was hopeful that she would be able to improve with the medications Dr. Benghozi was prescribing.

11

Dr. Benghozi sent a new report on April 3, 2009. He opined that her level of functioning had declined and that she was still not capable of gainful employment.

On March 23rd a new physician consultant review report was issued by MetLife, this time from Dr. Rummler, a psychiatrist. MetLife apparently chose not to have Dr. Clark review the case again, even though he was familiar with it, having already reviewed it once and having found plaintiff unable to work. Rummler issued an addendum to the report on April 15th, after Benghozi's latest report.

Rummler summarized the medical records and then opined that "there is no information to support impairment from 11/25/08." His conclusion was based on the fact that, in his opinion, there were no severe psychiatric symptoms and plaintiff did not require inpatient admit. He suggests that it is unclear why plaintiff is on Wellbutrin[3] (although the medical records are replete with references to plaintiff's depression). He says there are no objective signs of cognitive impairment and no psychotic symptoms (neither of which is required for a diagnosis of Bipolar II disorder.

Rummler based his opinion in large part on the issue of plaintiff's attempts to become pregnant. He said:

---

[3]Wellbutrin (Bupropion) is used to treat depression.  See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health

"Claimant's letter suggesting that her provider told her to be off medications is not accurate as it was claimant's intention to become pregnant that led to her being on no medication.[4] Claimant's desire to be pregnant resulting in being on no medications reflects lack of acuity in symptoms as well as reflecting an awareness of intact skills to deal with pregnancy and taking care of an infant." [Footnote added].

Rummler also states that there is "no global limitation in functioning due to psychiatric impairment". In his addendum, apparently still preoccupied with the pregnancy issue, he reasons that:

"Psychiatrist states that claimant has wanted to be off meds to become pregnant, whereas therapist clearly states psychiatrist has advised claimant to become pregnant.[5] This would indicate that ether (sic) psychiatrist does not feel claimant is significantly impaired, as it would not be logical to add the stress of pregnancy to a person with significant psychiatric symptoms, or claimant does not feel significantly impaired, as she if (sic) refusing meds and evidently feels

_____

[4] Wellbutrin contains a warning to talk to your doctor is you are pregnant or wish to become pregnant. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health. It seems moot then whether plaintiff was smart enough to take herself off Wellbutrin or whether Dr. Benghozi did.

[5] The two are not mutually exclusive; the plaintiff may well desire pregnancy and Dr. Benghozi might well consider that it would be therapeutic.

stable enough without meds to pursue life goals such as pregnancy." [Footnote added].

 Rummler also states that "claimant is noted in most recent visit as improved".

First, in Dr. Benghozi's latest report to which Rummler was referring, plaintiff's level of functioning was reported to have declined, not improved.

Second, defendant has not shown the court any requirement in the Plan or in the DSM that there be a "global limitation of functioning" in order to qualify for benefits under the Plan.

Third, Rummler's reasoning is illogical. That Dr. Benghozi might think it a good thing for plaintiff to become pregnant does not tend to prove that he thinks plaintiff does not suffer from Bipolar II disorder or that he thinks she can work, nor does plaintiff's desire to become pregnant tend to prove that plaintiff "does not feel impaired". More importantly, though, is the fact that Rummler attempts to use this faulty logic regarding pregnancy to mind read what Dr. Benghozi must think, when all we have to do to know what Benghozi thinks is to read his numerous medical reports. He thinks plaintiff has Bipolar II disorder and cannot work.

 Similarly, whether plaintiff "feels stable enough without meds to pursue life goals such as pregnancy" is irrelevant. The issue is whether plaintiff suffers from Bipolar II disorder and

14

whether she is too impaired to work.[6] Those determinations are to
be made by strict reference to the Plan language, which in turn
references the DSM of Mental Disorders.  It is not to be made by
circuitous logic by a consultant who attempts to read the mind of
the treating physician in order to opine that the treating
physician did not mean what he said. Such cannot constitute
concrete evidence.  Further, there is no requirement in the Plan
that plaintiff cannot be considered disabled if she becomes, or
wishes to become, pregnant. Nor does the DSM suggest that a finding
of pregnancy rules out Bipolar II disorder. Defendant has provided
the court with no studies or other evidence that pregnancy and
Bipolar II disorder are mutually exclusive.

     In this case, the only concrete evidence in the case is that
submitted by Dr. Lord, therapist Blackman and Dr. Benghozi, as well
as by Dr. Clark. While a treating physician's opinion is not
entitled to more weight than that of a physician who only reviews
records, Dr. Rummler's report contains nothing on which to base a
finding of non-disability other than his faulty logic that Dr.
Benghozi meant something other than what he wrote in black and
white on his reports. Rummler suggests the absence of certain
symptoms, yet none of those symptoms are required for a diagnosis

---

[6] It does not appear that MetLife seriously contests the
diagnosis of bipolar II disorder; rather, its termination of
benefits appears to be based on its claim that plaintiff is not
impaired from working.

of bipolar disorder or a finding of impairment. Rummler's opinions are not based on the Plan language nor on the DSM and therefore must be rejected as irrelevant. His ignoring the DSM, is at the very least, odd. While a lack of evidence can constitute concrete evidence, here there is no lack of evidence, rather, there is substantial evidence of both a diagnosis and impairment as defined by the Plan.

## Conclusion

The medical evidence in the case shows that plaintiff has Bipolar II disorder and cannot work.

For the foregoing reasons, the Court finds, after reviewing the record and considering defendant's dual role as insurer and plan administrator, that the decision of the administrator is not supported by substantial and concrete evidence and is arbitrary and capricious and an abuse of discretion.

IT IS RECOMMENDED that plaintiff's appeal be GRANTED and that benefits be ordered paid as of the date of termination and subject to the policy terms for the duration of the benefit period.

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within fourteen (14) days after being

16

served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing.  Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this 28th day of July, 2010.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE